### SMITH et al. v. JORDAN.
### No. 14020.

Court of Civil Appeals of Texas. Dallas.
April 29, 1949.

Dissenting Opinion May 6, 1949.

H. E. Tarpley and Jerome Chamberlain, both of Dallas, for appellants.

J. Alex Blakeley and Marvin Jones, both of Dallas, for appellee.

CRAMER, Justice.

This is an action under Art. 4004, R.C.S. 1925, for damages, actual and exemplary, by Fred Jordan against E. J. Smith and M. L. Long, growing out of the sale of real estate to Jordan by E. J. Smith, through Long as real estate agent. Trial was to the court without a jury and resulted in judgment for Jordan against Smith and Long, jointly and severally, for actual damages in the sum of $500 and against E. J. Smith, individually, for exemplary damages in the sum of $250. Smith and Long have perfected their appeal from such judgment.

An examination of the evidence, which sustains the court's judgment, reveals that Long testified that he pointed out the lines of the property sold; that it was his duty as a real estate man to find out where the property lines were and to show the lines to his purchaser. Jordan knew nothing about the property lines except what Long told him, and Long told him the fence was on the line.

Appellants assign five points of error: (1) Statements by agent Long were not false representations, but merely expressions of opinion; (2) which Jordan did not rely on; (3) that Smith made no representations and there is no evidence that Smith had any knowledge of the statements made by Long; (4) the presumption of falsity and fraud is overcome by testimony showing they were made in good faith; and (5) Smith and Long were prevented from correcting the error by Jordan's refusal to accept title by limitation to the unconveyed strip of land.

Jordan testified about the sale as follows:

"Q. Now, after you got the deed to the property, what did you do, Mr. Jordan? A. Well, on the day that the deed was given to me, Mr. Smith wanted me to pay him for the butane that was in the tank out there, and I said, 'How do I know how much to pay you?' and he said, 'We will go out and read the meter and see how much is in there,' and we went out and read the meter and I asked him which of those fences was the line. He was the seller, and I wanted the truth about it.

"Q. What did he tell you? A. He said, 'For your information, this stake right here by the butane is yours.' Part of the butane tank would be off of my property. The butane tank sits across the property line. * * *

"Q. Now, what other conversation did you have with Mr. Smith at that time? A. I said, 'Here you have sold me a house that is not on the property.' He said, 'I figured you were fifteen feet better off than what you thought you were.' I asked him how he figured that. He said, 'That can be bought.' I said, 'You didn't sell it to me, though.'

"Q. What did you do then? A. I asked him what he was going to do about it, that I wasn't satisfied with the deal and I wanted it straightened up. * * *

"Q. Did they come out the next day? A. Yes, sir.

"Q. Who was present at that time? A. Mr. and Mrs. Smith and my wife and I.

"Q. What transpired then? A. Well, I contended that I had been wronged and wanted the thing righted. Mr. Smith said, 'I had a horse and I couldn't ride. Now you ride it.' He said, 'I don't aim to do anything.'

"Q. Did you offer to give the property back to them? A. I offered to lose two hundred dollars if they would take the property back.

"Q. He refused to do it? A. He wouldn't do it, no. He said he wouldn't do it because he didn't want it; that was the reason he got rid of it, because he didn't want it.

"Q. What next happened? A. I lost my temper."

A survey thereafter made shows that a part of the house, part of the butane.tank, and the side fence were outside the lot conveyed. Art. 4004, R.C.S. 1925, provides in part:

."Actionable fraud in this State with regard to transactions in real estate * * * shall consist of either a false representation of a past or existing material fact, * * * but for which promise said party would not have entered into said contract. * * * All persons guilty of such fraud shall be liable to the person defrauded for all actual damages suffered, the rule of damages being the difference between the value of the property as represented or as it would have been worth had the promise been fulfilled, and the actual value of the property in the condition it is delivered at the time of the contract. All persons making the false representations or promises and all persons deriving the benefit of said fraud, shall be jointly and severally liable in actual damages, and in addition thereto, all persons wilfully making such false representations or promises *or knowingly taking the advantage of said fraud* shall be liable in exemplary damages to the person defrauded in such amount as shall be assessed by the jury, not to exceed double the amount of the actual damages suffered."

██ Title by limitation is not a marketable title. Myrick v. Leddy, Tex.Civ. App., 37 S.W.2d 308. Jordan, therefore, was under no obligation to accept title by limitation, assuming it could be obtained; but could elect to sue for his damages. A representation in a real estate sale, as to improvements or other objects of value being located on the premises, is one of fact, and, if false, is actionable. Flusche v. Uselton, Tex.Civ.App., 201 S.W.2d 58 (Syl. 7); Schonrock v. Taylor, Tex.Civ. App., 212 S.W.2d 260 (Syl. 1 and 4) (error ref.).

██ The rule or measure of damages in fraud cases involving real estate is set out in the statute quoted above, passed in 1919, and superseded the former rule. Reed et al. v. Hester et al., Tex.Com.App.,

44 S.W.2d 1107 (holdings in opinion by Justice Sharp, then a Commissioner, approved by the Supreme Court). As applied to this case, the rule would be the difference between the value of the property as represented and the actual value of the property at the time of the contract with the title in the condition in which it was delivered.

■ However, there is no assignment attacking the amount of damages, either actual or exemplary, and it is presumed that the trial court applied the correct rule.

■ "The rule is that, where a land owner has been fully apprised of the fact that the sale of his land was procured by the fraud of the broker, and with full knowledge of such fact he declines to rescind, but affirms the sale and retains the fruits of the deal, he ratifies all that has been done by the broker and is responsible for all fraudulent conduct, to the same extent as though he had committed such fraud in person." Donigan v. Polacek, Tex.Civ.App., 85 S.W.2d 771, 772:

■ Under the evidence, Smith ratified Long's representations by refusing to rescind the sale when Jordan advised him they were made, and is liable with Long for the damage sustained by Jordan.

■ Since the trial court's findings are sustained by substantial evidence, they are binding on us. The judgment is therefore affirmed.

BOND, Chief Justice (dissenting).

I am not in accord with the majority in affirming the judgment of the trial court. The uncontroverted testimony reveals conclusively that appellants are not guilty of actionable fraud either in common law or statutory, Art. 4004, R.C.S., to impress upon them actual damages—more pronounced, exemplary damages. A very novel situation is here presented where exemplary damages are assessed against the owner, Smith, in favor of the purchaser, Jordan, for acts claimed to have been fraudulently committed by the real estate broker, Long, because, forsooth, the owner would not repent, rue back, on the trade involved; and, too, let the broker escape exemplary punishment.

The broker, alone, contacted the purchaser, made a written contract with him (not offered in evidence), finally closed the deal on terms acceptable to the purchaser, and, if any fraudulent representations were made as to induce the purchaser to execute the contract in suit, such were not made with the knowledge, acquiescence, or consent of the owner. The purchaser got what he claims he should have gotten.

"A judgment for exemplary damages is not sustainable where the evidence shows that the defendant acted without knowledge that injury would result from his conduct, or, in other words, that the damage was done accidentally or unintentionally. Furthermore, although the defendant may in fact have foreseen or intended the consequences of his conduct, yet punitive damages may not be awarded where it appears that he acted in good faith or without wrongful intention, or in the belief that he was exercising a right. 'The intentional doing of a wrongful act without legal justification or excuse is ordinarily malicious; but although an act may be intentional, and may result in a wrong, yet exemplary damages should not be awarded, when it appears that there was no actual intention to invade any right.'" 13 Tex.Jur. p. 243, sec. 134.

The purchaser, Mr. Jordan, testified:

"Q. You purchased it through Mr. Long, did you not? He was the agent? A. He was the agent, yes, sir.

"Q. Is that the deed that was given you, Mr. Jordan? A. Yes, sir, that is the deed * * *.

"Q. Mr. Jordan, who showed you that property and sold it to you? A. Mr. Long, the agent.

"Q. Did you know Mr. Long prior to the time you purchased the property? A. For a few days * * *.

"Q. Did you know anything about this property other than what Mr. Long told you? A. I never had seen it before.

"Q. Now, in purchasing this property, were you relying on what Mr. Long told you about the property? A. Sure. * * *

"Q. Now, did you believe Mr. Long's representations about that property to you? A. At the time I bought it, I did, yes.

"Q. You thought they were true? A. I did * * *."

On cross-examination Mr. Jordan testified: "* * * Now after you had paid your money and had gotten that deed, you said that Mr. Smith went out there that day, didn't you? A. After the transaction was made.

"Q. And it was right there when you had your first conversation with Mr. Smith about that lot, wasn't it? A. That is right.

"Q. And that is exactly when he told you that when he bought that property, he understood that fence was the line and that it was supposed to be the line and he believed it was the line? A. No, he didn't tell me that the fence was the line. He said 'There is the line, right there.' * * *

"Q. And he told you he didn't know whether it was described in the deed or not, but if it wasn't, you had a deed coming to you and it could be gotten—he told you that? A. One time he told me a deed and another time he said he wouldn't.

"Q. And you said you wouldn't take it, didn't you? A. No, sir, I didn't.

"Q. You have occupied that property, and used it over there to that fence all the time, haven't you? A. Well, its on my side of the fence, all right.

"Q. You have had peaceful possession of it, haven't you? A. I suppose I have."

On cross-examination by Mr. Long's attorney, Mr. Jordan testified:

"Q. Mr. Jordan, you testified awhile ago that Mr. Long was going to show you some stakes but couldn't because they were covered with gravel; is that true? A. No, he didn't say he was going to. He said he couldn't because the ones on the front had been covered with gravel, and the septic tank and butane tank dirt being knocked around, he supposed had covered the one on the back.

"Q. Then he didn't ever show you any boundary lines? A. No, he didn't show me nothing.

"Q. Did he ever show you any particular thing that was the boundary line? A. * * * He said that the fence closest to the house was it * * *

"Q. After you were shown this property by Mr. Long, did you at a later date ask Mr. Smith where the boundary line was? A. On the day the deal was closed.

"Q. You asked him where it was? A. Yes, sir.

"Q. Then you were not relying on what Mr. Long told you? A. I did: when I bought it, but I wanted to know if they were both together on it and if Mr. Long could be wrong. People can be honest and be wrong.

"Q. Then you were not relying on what Mr. Long told you? A. I did as far as it went, because people can be honest and be mistaken."

On recross-examination by Mr. Smith's attorney, Mr. Jordan testified:

"Q. Mr. Jordan, is it a fact that you had this negotiation out there with Mr. Long and you bought this property and paid for it and got this deed before you ever had any conversation with Smith about the boundary? A. No, I never saw Smith until the day the deal was closed. * * *

"Q. After he signed the papers was when you had the conversation about the lines? A. Yes, sir. * * *

"Q. In all the conversations—went out and visited the property and saw the fence, and got a deed to that land and your wife was out there, and you didn't know anything about the fact that there was a little strip in there that went with the lot the house was on? You never heard of it at all? A. No."

It is a rule of general acceptation that to render a principal liable in exemplary damages for "fraud, malice, gross negligence, or oppression" on account of an act of himself or his agent, the tort action must be shown to have been acted "wilfully, maliciously, or fraudulently." "In order that the recovery of exemplary damages may be sustained, the plaintiff must show, not merely that the defendant could have or ought to have foreseen and prevented the loss or injury of which the plaintiff complains, but that he acted intentionally or wilfully or with a degree of 'gross negligence' which approximates a fixed purpose to bring about the injury of which the plaintiff complains." 13 Tex.Jur. p. 211,

sec. 133. In assessing exemplary damages against the owner Smith in the sum of $250, and letting the agent Long, who the evidence shows engineered the real estate deal, go free of wrongdoing, manifestly the trial court (affirmed by the majority) determined that Long was not guilty of any "wilfully making" false representations or promises inducing the sale of the property. In consequence, how, then, could it be reasonably said that Smith, who acted in the premises without knowledge, acquiescence, or consent of any misrepresentations or promises of his agent, would presume that the agent was so acting within the scope of his agency? Or that Smith was not acting in good faith in concluding the real estate transaction?

Under Art. 4004, R.C.S., upon which the judgment is based, it will be seen that "exemplary damages" are only assessed against those "jointly and severally" who are guilty of "wilfully making" false representations or promises, or "knowingly" taking the advantage of such fraud. Hence if Mr. Long was not guilty of fraud under the statute, supra, as to visit upon him exemplary damages, then certainly to that extent, at least, there should not be awarded against Smith the sum of $250 as vindictive or exemplary damages by way of punishment. The conduct of Smith in the transaction does not warrant such punishment. It is conclusively shown from the testimony quoted above that neither Long nor Smith is guilty of *wilfully*, or *knowingly* making any false and fraudulent representations in the transaction; thus, upon the provision of said Art. 4004, without evidence establishing false representation, wilfully or knowingly made as therein provided, the judgment awarding exemplary damages should be reversed and rendered for appellant Smith on the issue of exemplary damages.

In passing, under the facts in the case at bar, I am in accord with the Galveston Court of Appeals in Ulrich et al. v. Kreuger, Tex.Civ.App., 272 S.W. 824, 825, in which Judge Graves had this to say in reference to the provision of the above statute, Art. 4004, R.C.S., which was attempted to be made controlling in that case: "The cause therefore does not come within the purview of that act at all; but if it did, as presaged in our opinion in the Waugh Case, [Krueger v. Waugh] Tex.Civ.App., 261 S.W. at page 197, this court would hold invalid and void that provision of the act which apparently makes one merely deriving benefit from the fraud practiced by others liable not only for all the actual damages suffered, but also for exemplary damages as well—an unreasonable and discriminatory requirement, we think."

In respect to actual damages under Art. 4004, R.C.S., resulting from fraudulent representation of a material fact, fraud is founded upon knowing such representation to be false, or when the person making it does not know whether it is true or false, thus deceives another and thereby induces him to rely upon such representation to his damage. The facts presented here, seeking to bring the case within the purview of the statute, are that Long, the agent who contacted Mr. Jordan to sell him the land, showed him the boundary as he understood it from information he theretofore had acquired from a Mr. Ben Martin (the immediate predecessor of Mr. Smith). Mr. Long was then the agent of Mr. Martin and sold the land to Mr. Smith. The land in that transaction, as here, was designated in the deed as Lot 8, Block No. 10/5851 Southern Crest Addition to the City of Dallas, as recorded in the Deed Records of Dallas County, Texas; being 50 feet by 150 feet. The record shows that in August 1946, Mr. Martin purchased this same property (as described above) from a Mrs. Bell, including the dwelling house involved here. Mrs. Bell erected the house; she owned the land involved in this suit and all the land adjacent thereto; thereafter Mr. Martin conveyed this same property to Mr. Smith, and then Mr. Smith conveyed it to Mr. Jordan. The record further shows that neither Mr. Jordan nor any of his predecessors in title were ever disturbed in their possession; and no adverse claimant asserted any rights therein.

Appellee Jordan further testified:

"Q. What are the circumstances surrounding your purchase of this property? A. Well, he (Long) was out at my house on Saturday evening for me to sign a contract for the place out there and he hold

us about this place and described it to us and said it could be bought, that he had a lady coming from Wichita Falls the next day to buy it, but he would show it to us th next morning; and if we wanted it and would buy it before she got here, he would sell it to us. So he carried me out Sunday morning and showed me the place.

"Q. Who went with you? A. He and I went alone.

"Q. What did you do when you got there? * * * A. We walked around over the lot. I asked him, I said 'Long, you say this is a 50' x 150' lot?' and he said 'Yes, sir.' I said 'Which of these fences on the east is the line? There is a little offset, on the east is the fence.' He said 'the first one.' I said 'Where are the stakes?' He said 'Gravel has been put in here at the front and they are covered and a septic tank and butane tank have been put in at the back and dirt thrown around and they have been covered,' * * *.

"Q. What, if anything, did Mr. Long tell you about that offset in the fence? A. Well, I don't remember that there was anything at all said about the offset.

"Q. Did you notice the offset yourself? A. Yes, sir, I knew there was an offset * * *.

"Q. Is the offset in the fence at the point where the room extends over the actual property line? A. Right about where the center of the room is. It offsets about the center of the room, from a north and south standpoint. Well, a car just barely rubbed through there * * *.

"Q. Now, after you got the deed to the property, what did you do, Mr. Jordan? A. Well, on the day that the deed was given to me Mr. Smith wanted me to pay him for the butane that was in the tank out there * * * and we went out there to read the meter, and I asked him which of these fences was the line. He was the seller and I wanted the truth about it.

"Q. What did he tell you? A. He said 'For your information this stake right here by the butane is yours. Part of the butane tank would be off of my property. The butane tank sits across the property line.' * * *

"Q. Now, what other conversation did you have with Mr. Smith at that time? A. I said 'You have sold me a house that is not on the property.' He said 'I figured you were fifteen feet better off than you thought you were.' I asked him how he figured that. He said 'That could be bought.' I said 'You didn't sell it to me though.'

"Q. What did you do then? A. I asked him what he was going to do about it, that I wasn't satisfied with the deal and I wanted it straightened out.

"Q. What else was said or done at that time? A. Well, he told me I could go to Long and me and him and Long would try to settle it."

On cross-examination by the attorney for Mr. Smith, Jordan testified:

"Q. Where were you when you got this deed? A. They gave it to me in Mr. Long's office.

"Q. Did you read the deed? A. I don't know that I did, I don't recall that I read the deed, or that I didn't. * * *

"Q. In connection with the purchase of this property out there you got a lot of personal property—some furniture? A. That is right.

"Q. Is there anything in the deed about furniture? A. It is in a contract. I don't know whether it is in the deed or not. It is in the contract.

"Q. Where is the contract? A. I have got mine and Long had one and I reckon Smith got one. I am not too sure of that.

"Q. This deed just calls for Lot No. 8, Block 10? A. That is right.

"Q. 5851 Southern Crest Addition. It doesn't say anything about any house being on it and it doesn't say anything about any furniture or personal property going with it; just that description there. When did you have the place surveyed? A. I don't remember the date of that.

"Q. Wasn't it after you employed Mr. Blakely (attorney)? A. Yes.

"Q. What did you tell the surveyor to survey? Do you know? A. I told him that I wanted to establish my lines.

"Q. As shown by this deed—this particular lot? A. That is right.

"Q. Where did you get the idea that the line of the property, taken as a whole, on which that house was built is not at the fence that was pointed out to you? A. Mr. Smith.

"Q. He told you that the person who bought the house owned all the property at the time it was built, didn't he? A. Yes, but I didn't get it—

"Q. So it was about eleven days after you bought the property before you filed the deed. Now, after you had paid your money and gotten that deed, you and Mr. Smith, for the purpose of making a proration of the gas out there at the place, went out there that very day, didn't you? A. After the transaction was made.

"Q. When you got out there, you did measure that gas, didn't you? A. We read the meter.

"Q. And you did pay him for what you owed him, didn't you? A. Yes, sir.

"Q. And it was right there when you had your first conversation with Mr. Smith about that lot, wasn't it? A. That is right.

"Q. And that is exactly when he told you when he bought that property he understood the fence was the line and that it was supposed to be the line and that he believed it was the line? A. No, he didn't tell me the fence was the line."

It will be seen from the above testimony quoted in full from the record that this transaction is based upon a written contract for the sale and purchase of a particularly described tract of land; that the defendant received the same tract of land as described in the deed, and which they intended should be in the transaction; that Mrs. Bell was the servient owner of the Southern Crest Addition and owned the adjoining property and constructed a house thereon; that she and her successors in title, Martin, Smith, and Jordan, have been in actual peaceable possession of all the property involved in this suit. Hence whether the lot involved was described in the deed, or contract, Jordan and his predecessors in title have had and hold a well founded title, if not by deed, certainly by estoppel, to all property in their possession under the various conveyances. It is a fundamental principle of law that where the servient owner of real estate sells that to which he has title, and puts the purchaser in possession, the purchaser has a indefeasible right of title to the land thus sold; and that, too, whether or not it is correctly described in deed, or whether or not any deed was ever given to the purchaser. "Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has, in good faith, relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right either of property, of contract or of remedy." 2 Pom.Eq.Jur., 4th Ed., sec. 804; Keene v. Gold, Tex.Civ.App., 27 S.W. 2d 631, 633; Booty v. O'Connor, Tex.Civ. App., 287 S.W. 282, 291; Lockhart State Bank v. Baker, Tex.Civ.App., 264 S.W. 566, 569.

In the case at bar, Mrs. Bell, at the time she erected the house on Lot 8, Block 10, owned that lot and all the lots adjacent to and east of it. East and adjacent to Lot 8, she dedicated or retained an "easement" 15 feet wide (for what purpose the record does not show), and erected the house so as to extend over onto the easement approximately 4½ feet. In 1946 she sold the premises, land and improvements to Mr. Martin; then Mr. Martin sold it to Mr. Smith; then Mr. Smith sold it to Mr. Jordan. Each of the purchasers, in succession, has had open, continuous, peaceable, adverse possession of all the porperty. Then, how can it be said that Jordan did not get all for which he bargained? Where is the fraud in the transaction? "The principle underlying the doctrine of estoppel is that one who has contracted with another ought not to be permitted to deny what he has represented as being true." 14 Tex. Jur. 901, sec. 124.

Appellants assign error to the action of the trial court in rendering judgment for actual and exemplary damages, in that its findings are, briefly (more extended in the record): (1) "Contrary to the law, even though M. L. Long gave his opinion, as to

the boundary line in dispute, that he was guilty of actionable fraud under Article 4004 of the Revised Civil Statutes of Texas"; and (2) "not supported by the evidence." Germane to the aforesaid assignments, appellants present points of error as related in the majority opinion. So it cannot be said that there are no assignments attacking the judgment.

In all equity underlying the doctrine of estoppel, the judgment should be reversed and rendered as to exemplary damages awarded against Smith, and remanded as to actual damages against Smith and Long to afford them to do equity as outlined in their motion (Tr. p. 20) to obtain deed or acquittances of all adverse claims, if any, to any land not covered by the deed, and which may have been intended under the written contract.